IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOAN YATSONSKY, | : | No. 3:15cv1777 |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| v. | : | |
| | : | |
| STATE FARM FIRE & | : | |
| CASUALTY COMPANY, | : | |
| **Defendant** | : | |

## MEMORANDUM

Before the court is Defendant State Farm Fire and Casualty Company's (hereinafter "State Farm") motion for summary judgment on the sole remaining claim in this case–insurance bad faith under Pennsylvania law.  (Doc. 27).  For the reasons that follow, the court will grant State Farm's motion.

## Background

This matter arises out of a disputed claim on a homeowners insurance policy.[1]  In early January 2014, a pipe burst inside plaintiff's home causing extensive damage.  (Doc. 28, State Farm's Statement of

---

[1]  The parties agree that plaintiff insured her home under a State Farm homeowners insurance policy.  (Doc. 28, State Farm's Statement of Undisputed Material Facts ¶¶ 12-13, 28, 38, and 57).  The parties further agree that this policy was in effect on January 4, 2014–the day broken water pipes caused water damage to plaintiff's home.  (Id.)

Undisputed Material Facts (hereinafter "SOF") ¶¶ 13, 29).[2]  Specifically, on

January 4, 2014, plaintiff arrived at her home located in Waymart,

Pennsylvania.  (SOF ¶ 15).[3]  She opened the front door and water rushed

out of the doorway.  (Id.)

Plaintiff immediately called State Farm.  (SOF ¶¶ 15-16).  Plaintiff

told State Farm that water flooded the entire downstairs of her home,

including the kitchen, bathroom, living room, and bedroom.  (Id.)  State

Farm advised plaintiff to contact a plumber to determine the water's

source, while State Farm would contact a disaster mitigation service to

begin remediating plaintiff's home.  (SOF ¶ 16).

Three days later, on January 7, 2014, State Farm's mitigation

contractor, ServiceMaster, arrived at plaintiff's residence to begin

remediation services.  (SOF ¶¶ 18-21).  On January 18, 2014, a State

Farm claim representative inspected plaintiff's home.  (SOF ¶ 26).  During

the inspection, the claim representative noted the presence of mold in

_____

[2]  We cite to State Farm's SOF (Doc. 28) for statements which
plaintiff generally agrees with in her response (Doc. 36).

[3]  Plaintiff testified that since 2007, she lived approximately three to
four days a week at her Waymart home.  (SOF ¶ 60).  She lived the
remaining days of the week at an apartment she rented near her place of
employment, the Hershey Medical Center, in Hershey, Pennsylvania.  (Id.)

plaintiff's home and explained to plaintiff that mold is not covered under plaintiff's homeowners policy.  (SOF ¶¶ 27-28, 34).

A week later, on January 25, 2014, State Farm spoke with plaintiff's plumber.  (SOF ¶ 29).  The plumber advised State Farm that he cut out a hole in a section of drywall behind plaintiff's sink, which exposed two cracked water pipes.  (Id.)

On January 31, 2014, State Farm inspected plaintiff's home for a second time to review the cracked water pipes and water damage.  (SOF ¶ 30).  Based on its two prior inspections, State Farm mailed plaintiff an estimate of the covered damages to her home in the amount of $18,426.34.[4]  (SOF ¶ 31).  Plaintiff disputed this amount, and submitted an estimate from her contractor, Grimm Construction, estimating plaintiff's damages at $43,403.00.  (SOF ¶¶ 35, 39, 46-47).

On April 17, 2014, State Farm revised its property damage estimate and sent plaintiff an additional payment of $15,979.50 based on the Grimm Construction estimate, and for additional mitigation services rendered since February 1, 2014.  (SOF ¶ 50).  Thus, as of April 17, 2014,

---

[4]  Plaintiff's policy included the following coverage: Dwelling - $144,100; Personal Property - $98,250; and Loss of Use - Actual Loss Sustained.  (Doc. 28-3, Pl.'s Homeowners Ins. Policy at 2).

plaintiff received a total of $34,405.84 from State Farm.  (SOF ¶¶ 31, 50).

Plaintiff, however, disputed this amount, and the parties worked to resolve

plaintiff's claim over the next two months.  (SOF ¶¶ 51-53).

On June 21, 2014, State Farm met with plaintiff and Grimm

Construction at her home for an inspection.  (SOF ¶ 53).  Subsequent to

this inspection, State Farm revised is estimate for a second time and

mailed plaintiff an additional payment of $3,874.36.  (SOF ¶ 54).  State

Farm also advised plaintiff that she could claim an additional amount of

$11,719.32, upon the completion of repairs.  (Id.)  Accordingly, as of June

21, 2014, plaintiff received a total of $38,280.20 from State Farm with the

option of receiving an additional $11,719.32 upon completion of the

repairs.  (SOF ¶¶ 31, 50, 54).

Plaintiff, however, did not hire Grimm Construction to make repairs

to her home.  (SOF ¶ 64).  Rather, on December 30, 2014, plaintiff mailed

State Farm a copy of an estimate from a new contractor, LRM Custom

Builders, LLC (hereinafter "LRM Builders").  (SOF ¶ 65).  LRM Builders

estimated that the cost to remediate mold issues, dry the structure, install

a new kitchen and bathroom, install a new front entry door, install a new

green metal roof, and install and stain log cabin siding would total

$83,680.00.  (SOF ¶¶ 65-67).  Plaintiff, however, testified that she could

4

not determine whether LRM Builders' estimate contained costs related only to the January 4, 2014 water damage.  (SOF ¶ 68).

On January 9, 2015, State Farm met with plaintiff and LRM Builders to reconcile their estimates.  (SOF ¶ 70).  During this inspection, LRM Builders advised State Farm that it planned on tearing plaintiff's house down and building a new log cabin on the site of plaintiff's home.  (SOF ¶ 71).  The parties failed to resolve the discrepancies in estimates, and therefore, in June 2015, plaintiff hired LRM Builders to tear down her home and build a log cabin on the site.  (SOF ¶¶ 74, 76).

Plaintiff filed a writ of summons in the Court of Common Pleas of Wayne County, Pennsylvania, on April 27, 2015, and a complaint on August 26, 2015.  (Doc. 1-2, Compl.).  The two-count complaint alleged state law breach of contract and bad faith claims.  (Id. ¶¶ 13-25).

State Farm removed the case to this court on September 11, 2015, (Doc. 1), and filed a motion for judgment on the pleadings regarding Count I, breach of contract, on March 10, 2016.  (Doc. 17).  On April 27, 2016, the court granted judgment in favor of State Farm on plaintiff's breach of contract claim, finding that plaintiff commenced the instant action more than three (3) months beyond the one-year limitations period.  (Doc. 26). Thus, the sole remaining claim in this case is Count II, insurance bad faith

under Pennsylvania law.

After a period of discovery, State Farm filed a motion for summary

judgment on plaintiff's bad faith claim.  (Doc. 27, Mot. for Summ. J.).  The

parties have briefed their respective positions, bringing the case to its

present posture.

**Jurisdiction**

The court has jurisdiction pursuant to the diversity statute, 28 U.S.C.

§ 1332.  Plaintiff Joan Yatsonsky is a citizen of Pennsylvania.  (Doc. 1-2,

Compl. ¶ 1).  Defendant State Farm is incorporated under the laws of the

State of Illinois with its principal place of business in Illinois.  (Doc. 1,

Notice of Removal ¶ 14).  Additionally, the amount in controversy exceeds

$75,000.[5]  Because complete diversity of citizenship exists between the

parties and the amount in controversy exceeds $75,000, the court has

jurisdiction over the case.  See 28 U.S.C. § 1332 ("[D]istrict courts shall

---

[5] Where an appropriate claim for punitive damages is made, the amount in controversy requirement is generally met "because it cannot be stated to a legal certainty that the value of the plaintiff's claim is below the statutory minimum."  Huber v. Taylor, 532 F.3d 237, 244 (3d Cir. 2008) (internal citation, emphasis, and quotation marks omitted).  Here, plaintiff has made a claim for punitive damages under Count II–bad faith.  Thus, the amount in controversy is met because the court cannot find to a legal certainty that the value of plaintiff's claims are below the statutory threshold.

have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States[.]"); 28 U.S.C. § 1441 (stating that a defendant can generally remove a state court civil action to federal court if the federal court would have had original jurisdiction to address the matter pursuant to the diversity jurisdiction statute).  As a federal court sitting in diversity, the substantive law of Pennsylvania shall apply to the instant case.  Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)).

**Legal Standard**

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

7

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990).  The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the nonmoving party.  Anderson, 477 U.S. at 248.  A fact is material when it might affect the outcome of the suit under the governing law.  Id.  Where the nonmoving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by establishing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial.  Celotex v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories demonstrating that there is a genuine issue for trial.  Id. at 324.

**Discussion**

State Farm seeks summary judgment on Count II, insurance bad faith under Pennsylvania law, 42 PA. CONS. STAT. ANN. § 8371 (hereinafter "section 8371").  Pennsylvania courts have adopted the following definition

8

of "bad faith" on the part of an insurer:

> any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent.  For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (*i.e.*, good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

Perkins v. State Farm Ins. Co., 589 F. Supp. 2d 559, 562 (M.D. Pa. 2008)

(quoting Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688

(Pa. Super. Ct. 1994) (citations omitted)).

The Third Circuit Court of Appeals has adopted the Pennsylvania Superior Court's legal standard for testing the sufficiency of bad faith claims under section 8371, "both elements of which must be supported with clear and convincing evidence: (1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis."  Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir. 1997) (citing Terletsky, 649 A.2d at 688).  In deciding a motion for summary judgment, a court "must view the evidence presented in light of the [insured's] substantive burden at trial."  Nw. Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005).

While this test represents the general criteria, the Third Circuit has

recognized that bad faith conduct extends to "a frivolous or unfounded refusal to pay, <u>lack of investigation into the facts</u>, or a failure to communicate with the insured."  <u>Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.</u>, 193 F.3d 742, 751 n.9 (3d Cir. 1999) (emphasis added).

If a plaintiff prevails in establishing bad faith, section 8371 empowers the court to impose the following remedies: 1) an award of "interest on the amount of the claim" at a rate equal to "the prime rate of interest plus 3%"; 2) an award of "punitive damages against the insurer"; and/or 3) an assessment of "court costs and attorney fees against the insurer."  42 Pa. Cons. Stat. Ann. § 8371.

In the instant case, State Farm argues that plaintiff has no evidence to support her contention that State Farm lacked a reasonable basis for denying benefits or failed to fully investigate plaintiff's claim.  Therefore, judgment should be granted to it on the bad faith claim.  Plaintiff disagrees and contends that she has adduced sufficient evidence to find that State Farm committed bad faith in the handling of her claim.  Accordingly, we must determine whether plaintiff has submitted evidence that State Farm acted in bad faith.

As previously stated, plaintiff's argument with regard to bad faith relates to State Farm's investigation of her claim.  Plaintiff provides two

10

arguments to demonstrate State Farm's bad faith.  First, State Farm assigned an inordinate number of representatives to her claim.  Second, State Farm refused to timely pay the full value of her loss.  Rather, State Farm provided multiple estimates and payments over a seven-month period.  We address plaintiff's arguments in turn.

Plaintiff first argues that the high number of individuals assigned to her claim establishes bad faith.  Specifically, State Farm assigned at least thirteen (13) claims representatives to process her claim from January 4, 2014 to January 10, 2015.  (Doc. 28-4, Claim Log Notes at 1-19).  Plaintiff testified that "she was tossed around like a frisbee, one person then to the next person and then the next."  (Doc. 32-3, Dep. of Joan Yatsonsky at 145-46).  As such, plaintiff contends that the inordinate number of State Farm employees assigned to her claim establishes bad faith.  After a careful review, we disagree.

"Pennsylvania law provides that it is not bad faith to conduct a thorough investigation into a questionable claim."  Nw. Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 138 (3d Cir. 2005).  Here, plaintiff fails to present evidence that State Farm's claims management was anything other than what it claimed: an attempt to further investigate the water damage at plaintiff's home to determine the value of her claim.  Plaintiff has offered

11

no expert evidence pertaining to State Farm's investigation.  Plaintiff cites

no internal State Farm communication or testimony establishing that State

Farm acted out of spite during its investigation.  In sum, plaintiff has

presented no competent evidence from which a reasonable jury could find

that the number of State Farm employees assigned to her claim

establishes bad faith.

Second, plaintiff argues that State Farm's multiple estimates

demonstrate bad faith.  In early February 2014, State Farm estimated the

covered damages to plaintiff's home in the amount of $18,426.34.  (SOF

¶ 31).  On April 17, 2014, State Farm revised its property damage

estimate and sent plaintiff an additional payment of $15,979.50. (SOF

¶ 50).  Finally, on June 21, 2014, State Farm revised its earlier estimate

and mailed plaintiff an additional payment of $3,874.36.  (SOF ¶ 54).

Thus, as of June 21, 2014, plaintiff received a total of $38,280.20 from

State Farm.  (SOF ¶¶ 31, 50, 54).  According to the plaintiff, the $19,000

difference between State Farm's estimates over a six-month period

establishes that State Farm refused to fully investigate her claim and

timely pay the amount of loss she incurred.

Plaintiff, however, cites no authority, and our research has

uncovered none, to support her proposition.  Indeed, cases point to the

opposite conclusion.  See Nw. Mut. Life Ins. Co. v. Babayan, 430 F.3d

121, 137 n.22 (3d Cir. 2005) (explaining that an insurer's low, but

reasonable estimate of damages or loss does not constitute bad faith)

(citing Terletsky, 649 A.2d at 689); see also Mirarchi v. Seneca Specialty

Ins. Co., 564 F. App'x 652, 656 (3d Cir. 2014) ("That subsequent

estimates assigned a higher value to the claim is not "clear and

convincing" evidence that the insurer acted in bad faith in arriving at its

initial estimate or by standing by that estimate until the appraisal process

concluded.").

Contrary to plaintiff's arguments, the undisputed facts establish that

State Farm conducted a detailed investigation over the course of one-

year.  State Farm inspected plaintiff's home on five different occasions

from January 2014 through June 2014.  (SOF ¶¶ 26, 30, 40-41, 43-44, 48,

53; Doc. 28-4, Claim Log Notes at 1-19).  During each inspection, State

Farm met with plaintiff, or plaintiff's contractor, and reviewed the damage

to plaintiff's home.   (SOF ¶¶ 26, 30, 40-41, 43-44, 48, 53).  The parties

also attempted to reconcile the estimates at these meetings.  (Id.)

Additionally, based on its inspections, State Farm mailed payments to

plaintiff totaling $38,280.20 from January 2014 - June 2014.  (SOF ¶¶ 31,

50, 54).  These $38,280.20 payments are only $5,122.80 less than

plaintiff's initial $43,403 estimate from Grimm construction.[6]  (SOF ¶¶ 31, 46, 50, 54).

Plaintiff, however, did not hire Grimm Construction to make repairs to her home.  (SOF ¶ 64).  Instead, on December 30, 2014, plaintiff mailed State Farm a copy of an estimate from a LRM Builders.  (SOF ¶ 65).  LRM Builders estimated that the cost to remediate mold issues, dry the structure, install a new kitchen and bathroom, install a new front entry door, install a new green metal roof, and install and stain log cabin siding would total $83,680.00.[7]  (SOF ¶¶ 65-67).

LRM Builders, however, did not make any repairs to plaintiff's home. (SOF ¶¶ 65-72).  Rather, a year and a half after water damaged plaintiff's home, plaintiff hired LRM Builders to tear down her home and build a log cabin on the site.  (SOF ¶¶ 74, 76). Thus, plaintiff has failed to demonstrate that State Farm's multiple estimates over a seven-month

---

[6]  State Farm also advised plaintiff on June 21, 2014, that she could claim an additional amount of $11,719.32, upon the completion of repairs. (SOF ¶ 54).  The additional $11,719.32 State Farm payment would bring the total amount plaintiff received from State Farm to $49,999.52, which is $6,596.52 **more** than Grimm Construction's initial estimate.

[7]  Plaintiff testified that she could not determine whether LRM Builders' estimate contained costs related only to the January 4, 2014 water damage.  (SOF ¶ 68).

period establishes bad faith.

In short, plaintiff has failed to produce evidence "so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." <u>J.C. Penney Life Ins. Co. v. Pilosi</u>, 393 F.3d 356, 367 (3d Cir. 2004).  At most, the available evidence may demonstrate that State Farm's investigation and estimates were arguably negligent.  The bad faith doctrine, however, is not implicated by mere negligence.  <u>Terletsky</u>, 649 A.2d at 688.  Accordingly, the court will grant State Farm's motion for summary judgment on plaintiff's bad faith claim.

**Conclusion**

Based upon the above reasoning, the court will grant State Farm's motion for summary judgement.  An appropriate order follows.

**Date:   12/05/2016**              **s/ James M. Munley**
                                    **JUDGE JAMES M. MUNLEY**
                                    **United States District Court**